5-19-0027 Block v. Office of the Secretary of State 5-19-0027 Block v. Office of the Secretary of State It's important to understand the nature of a whistleblowing case because it has a procedure that's a little bit different than most cases. The plaintiff is required to prove two things. One, the activity that he reported is protected under the Whistleblower Act. And that was found by the judge to be present here. So he ruled in Jeff's favor. The second thing that they have to prove is that their discharge or the actions taken against them were in some way related to their whistleblowing actions. If they proved those two things, then it turns to the state where the state can show basically an affirmative defense that this person would have been fired or the action would have been taken no matter what. What makes this unusual is the plaintiff's standard of proof in those first two elements is by the preponderance of the evidence. The state's affirmative defense has to be proven by clear and convincing evidence. And I'm not aware of too many other causes of action where the standards are different in the same case, but they are here. So obviously the standard you're looking at is against the manifest weight of the evidence to overturn trial court. But what you have to look at that evidence was did that evidence support approving of the case under a preponderance of evidence standard? So I'm not sure the trial judge understood that that was the standard he had to use for the plaintiff because he doesn't elaborate in his ruling at all. In fact, he never got to that third stage because he said the plaintiff did not prove the second element. That's why we've asked that you overturn him on that. But it's possible you may have to send this back if you find it in our favor for him to make further determinations on the state's affirmative defense because he never ruled on that. It's important for us to talk a little bit about the purpose of whistleblowing laws. We hear a lot about it in the last few months because of what's going on in Washington, D.C., with them trying to conceal the identity of a whistleblower. That's not the purpose of whistleblowing laws. Obviously, Jeff Block, his identity is not concealed. He's filed a public lawsuit, public record. The purpose of these laws are to prevent the state from retaliating against them after they blow the whistle. That is the only purpose behind them is to protect that person from retaliation. Now, one of the cases cited by both sides in this case is the Wynn v. Illinois Department of Human Services. That case goes into a great amount of detail about a lot of the issues that we face here. Very rarely are these cases shown because somebody had an eyewitness who said, gee, we need to fire this guy because he blew the whistle. What evidence is there of standards of retaliation when it turns out that the testimony he lost that Mr. Wingo was already under investigation when he reported him, when your client reported him? It did, but Jeff Block had no way of knowing that when he blew the whistle. I mean, he came forward thinking this was, you know, first knowledge. What evidence is there of a proximate cause that his whistle blowing caused him to be fired? And that's what I want to get to. I mean, that's what my whole case is about is whether there's evidence of this. But what's important to look at that Wynn case is what they say can be considered what is evidence, because they talk about how most of these cases are tried on circumstantial evidence, and they say one of the things that you have to look at is how close in proximity and time do the actions against that person begin after they blow the whistle. And Wynn says three to eight months is easily within that time range, and even up to 11 months is considered significant. The problem is we've got suspicious activity starting here the very day he blew the whistle. And the thing went into hyperspeed within six weeks. Jeff Block blew the whistle on September the 12th, 2006. He has a meeting with some superiors that he tells us to, and before the end of the day, I think this was in the afternoon that he had the meeting, before the end of the day, Detective Pippin with Internal Affairs and Steve Ciappelli with the Inspector General's office was told about it. Before the end of the day, Pippin is researching whistleblowing laws. And you would think if they were telling what he said, they would be out investigating the allegations. Instead, Pippin is researching whistleblowing laws, and when he was asked why, he conveniently couldn't remember. But he's not a lawyer. Why is he? I mean, if you want to get around the rule, you've got to first understand how the rule works. So that was very suspicious the same day. Six weeks later, Jeff Block's superior, Sergeant Warren, gets a call from his estranged wife. Now, they're aware. They've been aware since the early part of 2006 that Jeff was having issues with his wife. They were separated. That his wife had issues telling the truth. His wife calls Jeff's superior and reports four things she claims he did or that was a problem. She claimed that Jeff had outstanding bad check charges against him in Jackson County. She claimed that she had filed a divorce against him but was afraid to have him served because she was afraid of him. I'm sure the police have their own database, but the rest of us should judicially, you know, judicially in two minutes figure out. There's no divorce case on file, and there's no charges pending in Jackson County. Third claim she made was that Jeff had one of the Secretary of State's other officers come by her house and check on her. All they had to do was pick up the phone and call their own police officer and ask, did he do this? Fifteen minutes, they could have discounted three of her allegations. They never checked out of here. But what they did was Sergeant Warren contacts Pippin. Pippin goes and talks to Sandy, and before the day is over, Pippin opens an investigation and puts a GPS on Jeff's car. Now, the Uniformed Police Officers Disciplinary Act has a lot of provisions in it. It's on page 11 of my brief. There's seven things that police officers are supposed to be protected by. One of the things is a complainant is supposed to reduce that complaint to an affidavit. And if you look at the section in the statute, which is 50 ILCS 725.8B, anyone filing a complaint against a sworn police officer must have a complaint supported by a sworn affidavit. That section of the statute goes on to talk about if they find out that that affidavit was filed in bad faith or that was a lie, it's automatically sent to the state's attorney for prosecution for perjury. They never asked Sandy Glott to sign any such affidavit. They proceeded against Jeff without following the rules because they were desperate to open an investigation. They didn't care what the basis for that investigation was because you can't fire someone without first having an investigation. So they broke the rules right there by opening an investigation into him without, well, under criminal terms, we would call it without probable cause. Then they went off on their own tangents looking for anything they could find against a man and never even bothered to check out before they found Sandy said. They didn't care what Sandy said. They didn't care if it was true or not. They needed that excuse to open that investigation, and they used it. A step forward about 30 weeks later, Pickham gives a call to Sergeant Houghton and asks him to interview Jeff. Now, this is where the Police Officers' Disciplinary Act comes into play because, like I said, there are seven things that are there that have to be done before they can conduct a disciplinary interrogation. First of all, they have to be read their rights. They have to be told they're under investigation. They have to be told they have a right to counsel. They have to be told that anything they say in that interrogation can be used against them. They have to be provided a copy of that sworn affidavit, and all the complaints have to be identified. None of this was done because they tried to claim in the beginning, well, this wasn't really an interrogation. However, Houghton admitted on the witness stand that he tried, he went to lengths to make sure he didn't tip Jeff off that he was under investigation. And then as soon as it's over, he reports what's said to Pickham and Wiley. And then he slipped up on his back and referred to what he had done in meeting with Jeff as a disciplinary interrogation. He knew what he was doing was wrong. Pickham knew it was wrong. What came of that? Well, one week later, he gets called in for an official disciplinary interrogation. Now, they followed six of the rules that time, but they still never told him that Sandy Block was the original complainant. They never provided the sworn affidavit because there wasn't. That interview was done with Lieutenant Geisel and Tim Young, another person with the inspector general's office. And this was when the ball was rolling. They were setting him up to be fired at this point. Let's jump forward a little bit to February of 2007, because Jeff had been, because of the, he had been diagnosed with Crohn's disease. He had problems with his wife and he had the problems with having to report another officer. He had some anxieties. I mean, I can't imagine the kind of stress that all that in one year is going to bring on a person. They had had him on a program where he was reporting biweekly to his superiors on where he was at with each of the cases he was handling, how he was handling the Crohn's, different things. And that officer testified at trial that what they were dealing with, this biweekly reporting, was not considered disciplinary proceedings. This is something they do to protect the officers but to make sure they're okay. These people in February of 2007 decided that Jeff needs another psych evaluation because they admitted on the stand, if he's not fit for duty, you can't fire him. So they order another psych evaluation from Dr. Killian, at which point Pippin goes out of his way to talk to the psychologist before the exam to make sure that Killian doesn't tell Jeff that Sandy was who started this. They continue to conceal that information from him. Then Dr. Killian comes up with the most unbelievable report I've ever heard of. He meets with Jeff one time, not only finds him fit for duty at that time, but decides that Jeff has been perfectly stable for seven years prior to that. Now, I don't know how he would determine that if he met with him 20 times. But to meet with somebody one year and give you a report on what their mental state was for the last seven years, I read that out like, you've got to be kidding me. But the bottom line is, he said, Jeff's fit for duty, that's the green light, they can fire him. And they did. And they did not go through any progressive discipline at all. They went from ground zero to termination like that, even though there was no other disciplinary proceedings against him. There was nothing in the insurgency during the prior 12 months that they could legally consider. They admitted that. So why did they go from zero to discharge that fast? At the end of the day, you've got two people outside the whistleblowing meeting that knows about it before the day is over and is researching whistleblowing laws. You've got Kippen, Warren, Guzman, Young, and Hoffman all violating the Uniformed Police Officers Disciplinary Act by concealing information from Block that he's entitled to under the statute. And they did this multiple times in multiple ways. You're dealing with an investigation that was open based on bogus information that was easily proven false within 15 minutes of receiving it, and they never followed up with any of it. Why? And the answer is simple. They had another agenda. They can't fire him without the investigation, and they needed an excuse for the investigation. Because as of October 26, 2006, when it was open, there were no complaints against Jeff by any of the police officers, by anybody in the general public other than Sandy. There were no disciplinary proceedings against him. He had not been written up for breaking any rules or not doing his job. In short, on October 26, 2006, there was absolutely no basis to suspect Jeff Block had done anything wrong. Yet they opened that investigation. Why? What other possible motive could they have had? Well, if we look at the evidence, there's nothing else that would present a motive other than his whistleblowing activity. You have to remember at this juncture that he's not an ordinary whistleblower. He did not just report a fellow officer. The guy he reported had been his friend all the way back to college. He reported one of his dearest friends. I am friends with Jeff Block personally and have been for years. I know what he did to him. I know how hard that was. But if you're on the other side of that coin, if you're not one of his friends and you're a police officer, you've got to be thinking, gee, if he can't cover his own friend's tail, he's not going to think twice about reporting me if he finds out something. I've got to get rid of this guy. And now he poses a danger to them. Now, am I suggesting that these are officers that might need to have somebody cover their tail? Well, when you consider how many times they've violated the Uniformed Police Officer Disciplinary Act, I would say they possibly are because they have graciously violated it. They knowingly violated it. And they're the kind of people that would be afraid of having somebody like him in their midst. Did he prove by a preponderance of evidence that the whistleblowing activity was a factor here? Yes, he did. Because there's no other motive for opening that investigation other than that. There's absolutely nothing in the record to show that these guys had a personal grievance against him, that he had done anything that was wrong. Why would you open an investigation with nothing more than sandy blocks worth and never check out a story? There was something else going on here. And that's the only logical reason. That is the circumstantial evidence that the Wynn case is talking about. And it started the very day he blew the whistle. Your Honor, despite the fact that we have whistleblowing laws out there supposedly to protect people, it doesn't. This is why you can't get people to come forward and report corruption and wrongdoing. Because they're going to try to find a way to get around it. And they did a good job of it. And what happened to him, I mean, it broke my heart when I saw this. Because I know how this man's stressed over this. I can't imagine what it would be like to have to turn one of my friends in. It's kind of interesting because Richard Whitney just left the courtroom two cases ago. Richard was the original lawyer for Jeff when this was in federal court. I had sent the case to him because Jeff was a personal friend of mine. If you look at the record, you're going to see he spoke of me in there because I was the one he called the night he had to go to Bobby Wingo's house. And I thought, I can't be a liar because of this. I know what this put this man through. And I know what they did to him. And it was just unbelievable. But there is no evidence in this case that there was anything else motivating this investigation other than whistleblowing. And according to the law, it doesn't have to be half the reason they did it. It doesn't have to be a third. It says if it involved it at all, if it played any role in it whatsoever in his firing or what led to his firing, it's a violation. I think in my brief, I said if this is a straw that breaks the camel's back, it's a violation. That straw is all it takes. So for them to the court to say there's not even enough evidence, hundreds of evidence, was just, it was unbelievable. Because there's no other motive for this. So we're asking the court to overturn that part of the decision. I'd love it if you just say that in the court and the state didn't prove their case. I don't know if you can do that. So, but you can't say that there was evidence. We met the burden of proof on preponderance and send it back at least before the determination by the trial court on whether the state met their burden. Thank you, Your Honor. Thank you, Your Honor. Good morning, Your Honors. May it please the court. Counsel. Assistant Attorney General Carson Griffiths on behalf of defendants. I'd like to start here with the standard of review because it's very important in this case. Counsel is arguing that really what this court needs to decide is whether he proved by preponderance of the evidence that blocks whistleblowing activity was a contributing factor in his discharge. That was for the trial court to decide. On appeal, this court's review is under the Mathis way of the evidence standard. And under that standard, if there's any evidence to support the trial court's factual finding, it should affirm it. This court shouldn't second-guess credibility determinations or re-weigh the evidence presented. And here, contrary to counsel's argument, there was absolutely evidence that blocks whistleblowing had nothing to do with the decision to discharge him. First, Stephen Roth, the director of the Department of Personnel, the ultimate decision-maker who decided to discharge Block, testified that there were three reasons for the discharge. First, Block engaged in a theft of time, essentially reporting to be on duty when actually engaging in personal activities, seeing to personal matters. Second, lying about that theft of time. Filing false cab reports saying that I'm performing an investigation or I'm writing reports at the Carbondale office when, in fact, he was going to his estranged wife's house in O'Fallon, Illinois, or he was sitting in his car in different parts of Carbondale, or he was going to friends' houses. And the proposed discharge letter drafted by Gina DeCaro and Stephen Roth and the Department of Personnel bolstered all that testimony. It listed those three problems. I'm sorry. The third problem, I omitted that, was his misuse of state property. He sped into the squad car repeatedly without justification, including traveling 100 miles an hour on his way to his estranged wife's house. And so the proposed discharge letter that ultimately said we're deciding to discharge you listed all those reasons. It didn't say anything about blocks whistleblowing. It didn't say anything about the meeting in September 2006. Moreover, there was also evidence that the investigation leading to the decision to discharge Block was not motivated by whistleblowing. So Captain Warren testified that he requested the investigation leading to the discharge because of Sandy Block's report about misconduct by Block, including claiming that he was on duty but then staying at home all day, not whistleblowing. And Captain Pippin testified that during the course of his investigation of those allegations, nothing that he did was influenced in any way by whistleblowing. Now, on appeal, Block is arguing essentially that there are certain pieces of circumstantial evidence which support an inference that there was a retaliatory motive here. But again, that argument, even if you take it on its face, fails under the MAFIS-Randy Evidence-Centered Review. It calls on this Court to reweigh the evidence that the trial court heard and said was insufficient to establish that the whistleblowing activity was a contributing factor in the discharge. Moreover, there were reasons why the trial court's findings that none of those pieces of evidence added up to a finding in Mr. Block's favor was reasonable. So again, counsel notes that Sandy Block's initial complaint that initiated the investigation was questionable and that we didn't do anything to look into it. That's incorrect. Captain Pippin testified in his evidence deposition at pages E312 and E321 that part of the reason he attached the GPS tracker to the car, in fact, the only reason, I think, was to make sure that she was telling the truth or not. That's the whole purpose for the investigation. She said Block isn't doing what he's supposed to be doing, and Pippin followed up on that. And even more importantly, the GPS tracker showed that her allegations were credible. They were true. She was saying he was reportedly on duty, but he wasn't showing up, and that's exactly what the GPS tracker showed, and that's exactly what Block admitted to during his interrogation on November 21, 2006. Also, this issue of Captain Pippin researching whistleblower laws. There's no evidence in the record through testimony or documentary evidence as to what Captain Pippin researched, why he researched it, what conclusions he drew about anything, and how that affected the investigation. In fact, to the contrary, Pippin testified again. My investigation wasn't influenced in any way by whistleblowing. It was directed at determining whether Sandy Block's allegations were credible. And moreover, the ultimate decision-maker here again, Stephen Roth, testified, I didn't order Pippin to do any research. So there's no way to show that any research somehow affected the decision to either discharge Block or impose some other kind of discipline. Moving quickly to the Disciplinary Act. Again, I'd like to emphasize that whether the Secretary of State complied with that act or not is not the issue here. In fact, those were two counts of the original complaint that were dismissed and that never went to trial. So that's not an issue. What Block would have to show is that the noncompliance with that act was for some reason motivated by a desire to retaliate against him. But there was no evidence of that. Again, Hoffman, who did, who allegedly didn't comply with the act, testified, I didn't view Block any differently because of the whistleblowing. It didn't change my opinion of him whatsoever. And even if Hoffman did not comply with the Disciplinary Act because he held some sort of grudge against Block, he had no responsibility for investigating Block, and he had no say in what the appropriate discipline was for Block. He was essentially walled off from that process except for interviewing Block on November 14th. Council also notes that the independent medical examination made some sort of questionable findings. Initially, I'd like to point out that's not in evidence. The report and the doctor's findings were not presented at trial, and Block absolutely could have done that, but he did not. Also, again, there's no evidence that Dr. Killian conducted that investigation, or, excuse me, conducted that examination because of a retaliatory motive. And Gina DeCaro expressly testified, the independent medical examination was because Block raised the issue of his depression, alleged depression and alleged PTSD, not as a cover for retaliation. She expressly testified to that. As to the issue of progressive discipline, again, whether the decision was fair or right, that's an issue that Mr. Block could have raised in his union grievance proceedings, and I don't know if he did offhand, but it's not the issue here. It's whether the discipline was related to whistleblowing. And Rob explained that it wasn't because, here, the severity of Block's misconduct, his deception of the Department of Police warranted an immediate discharge, and that everyone he knew who had been accused of and found guilty of the theft of time during his tenure had been discharged. Nobody had gotten off on a lesser punishment. And progressive discipline is generally reserved for minor interactions like showing up late to work, not for filing false reports with the department. And lastly, on the issue of timing, counsel's timeline laid out what he believed showed why the whistleblowing was related to the discharge, but he left out several intervening events that are critical and severed any causal connection between the whistleblowing and the ultimate decision to discharge. Again, Captain Warren received a complaint from Sandy Block saying Block was being derelict in his duties. Captain Warren requested that the chief of the Department of Police, Brad DiMuzio, open an investigation into that. DiMuzio referred it to Captain Pippin, who interviewed Sandy, attached a GPS tracker to Block's car, corroborated her allegations that he was being derelict in his duties and misusing state property and lying about it. Then Block was brought in for an official interrogation at which he confessed to all the misconduct. And he again confessed to all the misconduct in his response to the proposed discharge letter issued to him by the Department of Personnel. So all those facts clearly support, are clearly evidence that supports the trial court's factual finding. And under the manifest way to the evidence standard, this court shouldn't second-guess that finding. So unless this court has any questions. No. For those reasons and the reasons stated in our brief, we'd ask that you affirm the trial court's judgment. Thank you. Your Honor. Your Honor, as a matter of fact, I've never been a criminal lawyer in my 25-year career. So I don't know how it all works. I do know some of the terminology. And I do know that if this were a criminal case, we'd be talking about two things, probable cause and fruit of a poison tree. What was the probable cause of the investigation? All the stuff that they found out, they found out because they opened an investigation on October 26th. But that investigation was opened based upon Sandy's allocations. They had no other reason to open an investigation into Jeff Block. There's nothing in the evidence showing there was anything indicating there was anything suspicious going on with Jeff Block. You can't go kick in somebody's door, gather evidence, and then ask the judge to give you a retroactive search warrant. And you can't go to a judge and say, gee, I really want to search this person's house. He can't tell you why, just give me a search warrant. There's no probable cause. It gets thrown out. So everything that they're claiming that he got fired for was discovered pursuant to a bogus investigation that never had any probable cause to begin with. Now, I'm not here to make technical arguments about what should be considered, what shouldn't be considered. What I'm saying is you still have to go back to October 26th. What motivated them to open the investigation in the first place? Why would they do that? So all the stuff that they discovered was based on an investigation that was opened because they had no other basis for an investigation other than the fact they wanted to get rid of him because he was going to whistle. So is it possible that he might have gotten fired? Not possibly. Maybe he would have had progressive discipline. I don't know. But the question is, did this ball start rolling because of his whistleblowing activity? And the answer, based on the evidence in this case, is clearly yes. If it hadn't been for that, there wouldn't have been any reason for them to investigate Jeff Block. None whatsoever. Because the allegations that Sandy made, I mean, stop and think about the fourth allegation that Jeff's at his house all the time. He's not really at work. Sandy Block, according to the record, lived in Othello. Now, I may know the comes and goings of my next-door neighbor and the guy across the street, but I have no clue what somebody's doing 90 miles away unless I'm stalking them. And if that's the case, you've got some other issues the police need to be laying into. But the fact that she would know that Jeff is at his house when she goes 90 miles away, that should send up a red flag real quick. Did Jeff go to his house occasionally when he was patrolling? Yes. The man has Crohn's disease. And he said, I have to go use the bathroom quite a few times a day. If he's patrolling in Marion, in Marcusburg, where he lived, he would buy a couch. Nothing unusual about that. He did some things that he shouldn't have done. We don't deny that. But did those things amount to something that would completely, without any other prior stuff involved, get a man fired? Did the state show that this was normal? No, they didn't. They went from ground zero to termination, and they were determined to do that from day one. They knew they had to have an investigation to fire him. They intended on firing him all the way back in October of 2006. And they used a bogus basis to start an investigation to come up with all this. How many of us, if you really wanted to start putting GPSs on our car and looking at everything we said and did, how many of us would not have something that somebody couldn't say, you shouldn't have done that, you shouldn't have done that? I hate to think about somebody did it to me. I don't intend to do anything wrong. But you are talking about it now when they conferred with him. Not only did he turn his friend in, he admitted what he did. This isn't a deceitful person here. But they fired him anyway. Thank you. The case will be taken under advisory.